UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**MEARS TRANSPORTATION GROUP,
INC., a Florida corporation,**

    **Plaintiff,**

vs.                                                CASE NO.: 6:08-cv-1359-Orl-22-GJK

**ZURICH AMERICAN INSURANCE
COMPANY, INC., a foreign
corporation,**

    **Defendant.**
_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Plaintiff, MEARS TRANSPORTATION GROUP, INC. ("Mears") files this Motion for Summary Judgment and asks the Court to render summary judgment in its favor and against the Defendant, ZURICH AMERICAN INSURANCE COMPANY, INC. ("Zurich"). There is no genuine issue of material fact, and Mears is entitled to judgment as a matter of law. As grounds for this Motion, Mears refers the Court to the Agreed Stipulation of Undisputed Facts and Memorandum of Law set forth below.

## AGREED STIPULATION OF UNDISPUTED FACTS

1. Mears is in the transportation business and operates more than 950 vehicles, including taxi cabs, shuttle vans, motor coaches, and limousines. Mears' headquarters is located at 324 West Gore Street in Orlando, Florida, and comprises a number of different buildings. The M-4 Building contains the offices of Mears' business operations, housing the employees who perform Mears' dispatch operations and administrative functions.

2. Zurich writes various types of insurance coverage, including specialized environmental policies. Zurich is a New York corporation licensed and authorized to sell insurance in the state of Florida.

3. Mears has underground storage tanks (the "Tanks") and petroleum fuel systems on its property. To protect itself from potential liability and damages arising from possible leakage from the Tanks, Mears purchased an environmental insurance policy from Zurich.

4. On or about August 15, 2001, Zurich issued a "Storage Tank System Third Party Liability and Cleanup Policy," policy number USC 9270761, to Mears (the "Policy"). A true and correct copy of the Policy is attached as Exhibit "A." This policy was a renewal of prior policies.

5. The policies issued by Zurich contain the following pertinent provisions:

**I.   INSURING AGREEMENT**

   **COVERAGE A – FIRST PARTY CLEANUP  DISCOVERY**

   We will pay on behalf of the "insured" any "cleanup costs" required by "governmental authority" as a result of a "release(s)" that "emanates from" a "scheduled storage tank system(s)" at a scheduled location" that commenced on or after the "retroactive date" and is first discovered by the "insured" during the "policy period" provided the "claim" is reported to us during the "policy period" or any applicable extended reporting period. Coverage for "claim(s)" due to changes in "governmental authority" during any applicable extended reporting period is set out in EXTENDED REPORTING PERIODS (Section V).

**II   DEFINITIONS**

. . .

   **F.**   "Cleanup costs" means

   1.   the necessary expenses incurred in the investigation, removal, remediation, neutralization or immobilization of contaminated soil, surface water, groundwater, or other contamination . . .

**IV. EXCLUSIONS**

This insurance does not apply to "claim(s)," "cleanup costs", or "loss(es)" based upon or arising out of:

. . .

**L.** any costs for the reconstruction, repair, removal, maintenance, replacement, upgrading, or rebuilding of any "scheduled storage tank system," personal property, fixtures, buildings or any other improvements and any site enhancement or routine maintenance on, within, or under the "scheduled location(s)". . .

. . .

**VIII. CONDITIONS**

. . .

**F. CHOICE OF LAW** - In the event an "insured" and we dispute the meaning, interpretation or operation of any term, condition, definition, or provision of this policy, resulting in litigation, arbitration or other form of dispute resolution, the "insured" and we agree that the law of the state of New York shall apply without giving effect to any conflicts or choice of law principles . . . .

Exhibit A, pp. 1-8.

6. In or about the period beginning 1999 and ending 2001, petroleum fuel leaked from the Tanks insured by Zurich at Mears' property located at 324 West Gore Street in Orlando, Florida.

7. Thereafter, in or about March 2007, Mears began arranging for the removal of soil contaminated by the leak from the Tanks and remediation of the contamination.

8. In or about April 2007, Mears began excavation and remediation work on the property.

9. The Orange County Building Code and the Orange County Fire Code and other applicable laws required Mears to evacuate the personnel in the M-4 Building during the remediation and excavation efforts.

11. The removal and remediation of contaminated soil from Mears' property raised a number of health and safety concerns for the personnel who occupied the M-4 Building, including, but not limited to, the threat of soil vapors and fumes, vibrations due to sheet piling installation and removal, and the fire hazards caused by the closure of the M-4 East Building entrance. Thus, the cleanup process could not have been accomplished safely, or in accordance with applicable safety regulations, without the evacuation of Mears' personnel from the M-4 Building.

12. As a result, as part of the cleanup effort, Mears evacuated the M-4 Building, relocated the employees who worked there, and set up temporary business operations at an alternate location until the soil removal and remediation was complete.

13. The evacuation of Mears' offices, equipment, and personnel was necessary and integral to completing the removal of the contaminated soil from the property in accordance with applicable government safety regulations. The relocation of its personnel to an alternate location was necessary to the continuation of Mears' business operations, which would have stopped without the relocation.

14. Prior to the relocation of Mears' personnel, representatives of Mears discussed the need to evacuate and relocate Mears' personnel from the M-4 Building with various consultants, and determined that no alternative was feasible.

15. In accordance with the terms of the Policy, Mears submitted itemized claims for expenses incurred during the cleanup process, including a claim in the amount of $153,501.78 for expenses Mears incurred to evacuate and relocate personnel from the M-4 Building and re-establish operations at an alternate location.

16. Zurich has paid $431,035.85 of the claims submitted by Mears, but has declined coverage and refused to pay the $153,501.78 in expenses Mears incurred to evacuate and relocate its personnel from the M-4 Building while the cleanup was ongoing.

17. It is undisputed that Mears incurred $153,501.78 in expenses in evacuating and relocating its personnel.

18. The only dispute in this litigation is whether the policy provided by Zurich provides coverage for the evacuation and relocation expenses incurred by Mears.

19. On July 7, 2008, Mears filed suit in the Ninth Judicial Circuit in and for Orange County, Florida, seeking a Declaratory Judgment on the issue of insurance coverage and asserting a claim for Breach of Contract. [Doc. No. 2]. Zurich subsequently removed the case to this Court on August 6, 2008, [Doc. No. 1], and filed its Answer and Defenses on August 20, 2008 [Doc. No. 5].

20. Mears and Zurich have stipulated that the facts in this case are undisputed and that the issue of coverage presents a question of law that is ripe for determination by this Court.

## **MEMORANDUM OF LAW**

### **Introduction**

A petroleum leak from underground storage tanks on Mears' property caused extensive property damage and required Mears to incur hundreds of thousands of dollars in expenses for the removal and remediation of contaminated soil from Mears' premises. Because the cleanup process posed significant health and safety risks to Mears' personnel, Mears was practically and legally obligated to evacuate the heart and brains of its business operations and temporarily relocate its personnel and business offices to an alternate location until the cleanup process was complete. The expenses Mears incurred to relocate its personnel and business operations were

vitally necessary to and reasonably incurred as a result of the cleanup process. Under New York law, which governs this dispute, it was reasonable for Mears to expect that these expenses would be covered by the insurance policy Mears purchased from Zurich because the Policy contains a broad definition of cleanup costs. Moreover, any ambiguity in the Policy language must be construed in favor of Mears as the policyholder because Zurich could have provided a more specific definition of cleanup costs or, alternatively, explicitly excluded relocation expenses from coverage but failed to do so. Accordingly, as argued below, this Court should find that the expenses incurred by Mears are cleanup costs within the definition of the Policy and render summary judgment in Mears' favor.

## Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court must evaluate admissible evidence in the light most favorable to the nonmoving party, and the court may not make credibility determinations or weigh evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Where, as here, the parties file cross motions for summary judgment, each party must nonetheless demonstrate that there are no genuine issues of material fact. Al-Amin v. Smith, 511 F.3d 1317, 1325 (11th Cir. 2008) (subsequent history omitted).

## Argument

**I.  The Expenses Mears Incurred Relocating Its Personnel And Business Operations Following The Petroleum Leak Are Covered Under The Policy's Unambiguous Definition Of "Cleanup Costs" Because The Expenses Were Necessarily Incurred During The Removal And Remediation Of Contaminated Soil From Mears' Premises.**

Pursuant to the terms of the Policy, this matter is governed by New York law. [Complaint, Ex. A, ¶ VIII(F) at 9 - Doc. No. 2]. Under New York law, the interpretation of the meaning of an insurance policy is a question of law for the court, using the rules of contract construction. Teitelbaum Holdings, Ltd. v. Gold, 396 N.E.2d 1029, 1032 (N.Y. Ct. App. 1979); Mount Vernon Fire Ins. Co. v. Creative Housing, Ltd., 797 F. Supp. 176, 179 (E.D.N.Y. 1992) (subsequent history omitted). An insurance policy should be construed liberally in favor of the insured in full recognition of the underlying objective to provide coverage, not exclude it. York v. Sterling Ins. Co., 114 A.D.2d 665, 666 (N.Y. App. Div. 1985), aff'd, 492 N.E.2d 770 (1986). The terms of an insurance policy must be accorded their "natural and reasonable meaning," Doyle v. Allstate Ins. Co., 136 N.E.2d 484, 487 (N.Y. Ct. App. 1956), corresponding to "the reasonable expectation and purpose of the ordinary businessman." Ace Wire & Cable Co., Inc. v. Aetna Cas. & Sur. Co., 457 N.E.2d 761, 764 (N.Y. Ct. App. 1983), aff'd, 60 N.Y.2d 390 (N.Y. 1983). An ambiguity does not exist merely because two parties urge different interpretations. Breed v. Insurance Co. of North America, 385 N.E.2d 1280, 1283 (N.Y. Ct. App. 1978). Rather, an ambiguity exists when a provision in an insurance policy is susceptible to more than one meaning "when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." United States Fire Ins. Co. v. General Reinsurance Corp., 949 F.2d 569, 572 (2d Cir. 1991). Any ambiguities will be resolved against the insurer, as drafter of the policy. Greaves v. Public Serv. Mut. Ins. Co., 155 N.E.2d 390, 392 (N.Y. Ct. App. 1959). Where the insured has met its burden of showing that a valid insurance policy was in full force and effect and that it incurred a presumptively covered loss, the burden of proof shifts to the insurer to demonstrate that an exclusion contained

in the policy defeats the claim. Moneta Dev. Corp. v. Generali Ins. Co., 212 A.D.2d 428, 429, 622 N.Y.S.2d 930 (N.Y. App. Div. 1995).

Applying these principles to the instant case, there is no dispute that the removal and remediation of contaminated soil from Mears' property was the efficient cause of all the losses for which Mears seeks coverage, i.e., the cost of evacuating and relocating its equipment and personnel from the M-4 Building to a temporary location. The language of the Policy broadly defines cleanup costs as the "necessary expenses incurred in the [removal and remediation of contaminated soil]" without limitation. Clearly, the expenses incurred by Mears were necessarily incurred in the cleanup process because the act of removing and remediating the contaminated soil rendered the M-4 Building unsafe and mandated an evacuation under the County's Building Code and Fire Code. A reasonable business man would not pay a substantial premium for an environmental cleanup policy that failed to provide coverage for these expenses. Indeed, it would be patently unreasonable to expect the buyer of an environmental cleanup policy to cease its business operations, displace hundreds of employees, and lose hundreds of thousands of dollars in revenue as a result of the cleanup, especially when the insurance policy contains a broad definition of "cleanup costs" and does not specifically exclude coverage for necessary relocation expenses.

This case is strikingly similar to the case of Three Palms Pointe v. State Farm Fire & Cas. Co., 250 F. Supp. 2d 1357 (M.D. Fla. 2003), aff'd, 362 F.3d 1317 (11th Cir. 2004). In that case, Three Palms, a condominium association, submitted an insurance claim to State Farm for $11,300,000.00 for a collapse that occurred on its property. Id. at 1359. State Farm did not dispute that the collapse was covered by the condominium association policy but refused to pay $560,000.00 in resident relocation expenses, claiming that such expenses were not recoverable

under the policy. Id. The policy language at issue required State Farm to "pay the cost of replacing or repairing the lost or damaged property" but failed to define what costs were to be included in the definition of repair costs. Id. at 1359-60. The policy did not contain a "loss of use" or similar provision that explicitly provided coverage for relocation expenses, nor did the policy explicitly exclude coverage for relocation expenses. Id. at 1360. Pursuant to the policy's terms, the parties engaged in an appraisal proceeding, and an arbitrator awarded Three Palms the $560,000.00 in expenses it incurred to relocate residents while repairs were being made to the condominium units, concluding that the relocation expenses were "a necessary and direct result of the construction and repair process." Id. (internal quotations omitted). Three Palms subsequently filed an action in the district court to confirm the arbitrator's appraisal award and for a declaratory judgment that the insurance policy provided coverage for relocation expenses. Id. at 1359. Both sides moved for summary judgment or, alternatively, for judgment on the pleadings, asking the court to determine the issue of coverage as a matter of law. Id.

Applying Florida law, the district court confirmed the arbitration award and found that the policy covered the cost to relocate Three Palms' residents. Id. at 1363. Specifically, the court found that the policy language, in which State Farm agreed to cover the "cost of replacing or repairing the lost or damaged property," was unambiguous and meant that State Farm would pay "all costs that [were] directly related to restoring the [property] because of the covered loss." Id. The court emphasized that relocation of the residents was necessary because the repairs would cause the units to be uninhabitable as the repairs would block the residents' access to kitchens and bathrooms and result in the release of dangerous asbestos fibers into the air. Id. at 1363-64. Consequently, because the repairs could not be performed safely without the relocation

of the residents, the cost to remove and relocate the residents was included in the repair costs covered by the policy. Id.

In reaching its decision, the court rejected State Farm's argument that the relocation expenses were too collateral to be covered by the policy, reiterating that the relocation expenses were directly caused and made necessary by the repairs. Id. at 1364. In addition, the court distinguished the case from one where relocation expenses are caused by the underlying loss and emphasized that "[b]ecause the method of repairing the units, not the collapse itself, made the units uninhabitable," the relocation expenses were repair costs covered by the policy. Id. at 1365. The court also rejected State Farm's argument that the absence of a loss of use provision prevented coverage of relocation expenses, pointing out that the argument "cuts both ways because it could be argued that the absence of an exclusion for loss of use allows for personal relocation expenses to be recovered," which the court considered the "more forceful" argument. Id. Ultimately, however, the court concluded that it "need not depend on the absence of a loss of use provision or exclusion because relocation costs [were] covered as repair costs under the plain meaning of the [p]olicy." Id.

Except for the fact that the Three Palms case involved repair costs and the instant case involves cleanup costs, the two cases are nearly identical. Here, like in Three Palms, the Policy does not delineate what types of costs are included in the definition of cleanup costs. In addition, the Policy does not contain a "loss of use" provision that explicitly provides for relocation expenses, nor does the Policy explicitly exclude coverage for relocation expenses. Further, similar to the threats caused by the repairs in Three Palms, the soil removal and remediation in this case resulted in blocked access to fire exits in the M-4 Building and the release of dangerous gasoline vapors that caused the building to be uninhabitable. These dangerous conditions

required Mears to evacuate and relocate its personnel during the cleanup process to comply with Orange County's Fire Code and Building Code. Therefore, because the cleanup of Mears' property could not be performed safely, or legally, without the relocation of Mears' personnel, the cost to evacuate and temporarily relocate the personnel is included in the cleanup costs covered by the Policy.

Notably, although the Three Palms case was decided under Florida law, the principles of insurance policy interpretation relied upon by the court are indistinguishable from New York law. There is nothing under New York law, or the Policy itself, that supports Zurich's proposed narrow definition of cleanup costs. Importantly, Zurich could have included a more specific definition of cleanup costs in the Policy and enumerated the types of costs contemplated within coverage, but failed to do so. When an insurance company, in drafting an insurance policy, uses a "slippery" term to designate the types of costs that are insured by the policy, it is not the court's function to "sprinkle sand upon the ice by strict construction of the term." C.D. Spangler Const. Co. v. Industrial Crankshaft & Eng. Co., Inc., 388 S.E.2d 557, 569 (N.C. 1990). Instead, all expenses that may, by any reasonable construction of the term "cleanup costs," be included within the coverage afforded by the Policy should be given its protection. "If, in the application of this principle of construction, the limits of coverage slide across the slippery area and the [insurance] company falls into coverage somewhat more extensive than it contemplated, the fault lies in its own selection of the words by which it chose to be bound." Id. Consequently, having selected the slippery term "cleanup costs" and having elected not to clarify the term by specifically defining it in the Policy, Zurich should be required to extend full coverage for all of the expenses Mears incurred during the cleanup process, including the cost to relocate its personnel and business operations temporarily until the cleanup effort was complete.

It is worth noting that both New York and federal law regarding environmental spills include relocation expenses in damage awards for cleanup costs. Specifically, New York's Navigation Law defines "cleanup and removal costs" for petroleum spills to include costs associated with the relocation of residents affected by the spills. N.Y. Navigation Law § 172(5) ("cleanup and removal costs' means all costs associated with the cleanup and removal of a discharge including relocation costs . . . ."). In addition, cleanup and removal costs assessed under the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") include such action as may be necessarily taken in the event of an environmental spill, including "temporary evacuation and housing of individuals threatened" by the cleanup process. 42 U.S.C. § 9601(23). While these laws are not directly at issue in this action, they nonetheless bolster Mears' position that it was reasonable from the standpoint of an ordinary business man to expect that the Policy – purchased by Mears to cover the costs of a government-mandated cleanup of a petroleum leak – would cover all reasonable and necessary costs incurred in the cleanup process, including the cost to relocate personnel while the cleanup effort was ongoing.

## II. If The Court Finds The Term "Cleanup Costs" Ambiguous, The Court Should Construe The Term In Favor Of Mears As The Policyholder To Provide Coverage For Relocation Expenses.

As noted above, the terms of an insurance policy are generally accorded their ordinary, usual meaning. If, however, a single plain meaning cannot be determined for a term – that is, if the term is susceptible to two or more reasonable interpretations – the ambiguity must be resolved against the insurer as the drafter of the policy and consistent with the insured's reasonable expectation of coverage. Guardian Life Ins. Co. of Am., Inc. v. Schaefer, 519 N.E.2d 288, 289 (N.Y. Ct. App. 1987). The insurer has the burden of establishing that the words and

expressions used in an insurance policy not only are susceptible of the insurer's proposed construction but that the construction urged by the insurer is the **only** construction that can fairly be placed on the policy language. Hartol Prods. Corp. v. Prudential Ins. Co., 290 N.Y. 44, 49, 47 N.E.2d 687 (N.Y. Ct. App. 1943). Of course, an insurer has the ability to minimize the risk that an ambiguous term will be construed against it by expressly defining the term in the first instance or by explicitly delineating any exclusions from coverage in the language of the policy.

Here, Zurich could have easily excluded relocation expenses from the Policy's definition of cleanup costs but did not. Thus, to the extent the Court finds that Zurich's failure to do so created an ambiguity, the ambiguity must be resolved in favor of Mears as the policyholder. See Janneck v. Metropolitan Life Ins. Co., 162 N.Y. 574, 577-78, 57 N.E. 182 (N.Y. Ct. App. 1900), aff'd, 162 N.Y. 574, 57 N.E. 182 (N.Y. 1900) ("[I]nsurance contracts, above all others, should be clear and explicit in their terms. They should not be couched in language as to the construction of which lawyers and courts may honestly differ. In a word, they should be so plain and unambiguous that men of average intelligence who invest in these contracts may know and understand their meaning and import."). In any event, whether this Court finds the term "cleanup costs" includes relocation expenses under the plain meaning of the Policy, or whether the Court finds the term ambiguous and construes it against Zurich in favor of coverage, this Court should render summary judgment for Mears.

### III. The Policy Exclusion Zurich Relies Upon To Deny Coverage Has No Application To This Case.

The standard for determining the applicability of an insurance policy exclusion to a particular claim is well established under New York law. "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case."

Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 642 (N.Y. 1993). "[P]olicy exclusions are given strict and narrow construction, with any ambiguity resolved against the insurer." Belt Painting Corp. v. TIG Ins. Co., 100 N.Y.2d 377, 383 (N.Y. 2003).

In an attempt to justify its refusal to provide coverage for all of Mears' cleanup costs, Zurich relies on a Policy exclusion that states that there is no coverage for "cleanup costs" based upon or arising out of "any costs for the reconstruction, repair, removal, maintenance, replacement, upgrading, or rebuilding of any 'scheduled storage tank system,' personal property, fixtures, buildings or any other improvements and any site enhancement or routine maintenance on, within, or under the 'scheduled location(s)'. . . ." Policy, IV(L) (Exhibit A, p. 4). The language, content, and structure of the exclusion shows that it does not apply to this case. By its plain language, the exclusion only pertains to cleanup costs that arise from activities classified as "improvements," "site enhancements," and "routine maintenance," none of which apply here. In this case, the cleanup costs at issue -- Mears' relocation expenses -- arose from the remediation and removal of contaminated soil following a petroleum spill. Mears did not incur these expenses based on discretionary improvements or enhancements to its property or routine maintenance of its storage tanks. Moreover, Mears' relocation of its employees and business operations during the cleanup process cannot reasonably be described as "removal" of "personal property," "fixtures," or "buildings." Thus, the exclusion Zurich relies upon to deny coverage is inapplicable. At the very least, the exclusion is ambiguous because it does not refer to relocation expenses which could have easily been added to the exclusion language if Zurich intended for such expenses to be excluded from coverage. Thus, the Court must construe the exclusion narrowly and against Zurich and conclude that Mears is entitled to coverage.

## Conclusion

This Court should find that the Policy extends insurance coverage for all of Mears' expenses incurred in the cleanup of the petroleum leak on Mears' premises – including the expenses Mears incurred to relocate its personnel and business offices temporarily until the cleanup process was complete – and render summary judgment in favor of Mears on the claim for $153,501.79 with additional attorneys' fees and costs to be added to the judgment.

Respectfully submitted this 28th day of April, 2009.

> BAKER & HOSTETLER LLP
> SunTrust Center, Suite 2300
> 200 South Orange Avenue
> Post Office Box 112
> Orlando, FL 32802-0112
> Telephone: (407) 649-4000
> Facsimile: (407) 841-0168
>
> **ATTORNEYS FOR PLAINTIFF
> MEARS TRANSPORTATION GROUP**
>
>
> By: s/Marilyn G. Moran
>   Marilyn G. Moran
>   E-mail: mmoran@bakerlaw.com
>   Florida Bar No. 0163813
>   Scott E. Damon
>   Florida Bar No. 031909
>   E-mail: sdamon@bakerlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of April, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to the following: Louis Schulman, Esquire and R. Steven Rawls, Esquire, Butler Pappas Weihmuller Katz Craig LLP, counsel for the Defendant.

s/Marilyn G. Moran<br>
Marilyn G. Moran

502144161